and Jimenez v. Stanford, 2125A2. Thank you. Thank you both for your arguments, it's very stimulating and well-argued. Much appreciated. Thank you. Hold on one second until it counts. Mr. Garber? Yes, thank you. Please proceed. Good morning. My name is Glenn Garber, I'm the director of the Exoneration Initiative and we are honored to represent Petitioner Jimenez, an innocent man fighting to overturn his unjust conviction. Now this court, the case is before the court on de novo review and it's our view that all the ingredients are here for the court to grant a freestanding claim of actual innocence and to bring this doctrine finally over the finish line. I just want to get into, this was not a close gateway case. Our read of the record, and I think this is fair, is this was a— When you say finally over the finish line, you mean the merits finish line? I want, yes. Obviously we want them, we wanted to, there's a bunch of steps that I'm certainly going to get into, which is cognizability, and then if we have to go down that path, but over the finish line, meaning that the evidence, the full record here is a compelling case of actual innocence and we believe it's enough for relief on that claim. There are steps, as you just said, on the way there. Yes. There's also a step at the end, I think, that I'd just like to inquire into a little bit. You say get him finally over the finish line. Yes. What, if it's up to us to decide that he is actually innocent, in your view, and if we decide that, then he could not be retried? Well, if— Because you're saying we would make a finding, not just that no rational jury could have found guilty beyond a reasonable doubt, but that in fact it is established that he is innocent. So I'm having a little trouble understanding how there could be a retrial based on that finding. On the other hand, we have Ms. Velasquez out there, maybe. I don't know if she's alive or not, or findable or not, but she has not been testifying in any of these subsequent events. And when I'm trying to put my head around even the substantive question of actual innocence, I think, okay, am I to—and this is a question—am I to, in deciding that, imagine a hypothetical trial that was kind of just like the last one, except that this time Mr. Ramos would be testifying for the defense and being impeached with his prior testimony, or his prior testimony would come in for the government, and then he would get up and say, no, that's all false. And best-case scenario, Ramos creates all kinds of reasonable doubt and a minimum drops out of the case as a government witness. But suppose a jury then convicted based on Velasquez's testimony. On direct appeal, wouldn't a court be required to affirm that conviction because a reasonable jury could have believed Velasquez? So, as I understand the question, it's a philosophical question that cuts to the heart of what an actual innocence claim is. Yes, exactly. I think it's a very practical question. Well, it is a practical question. What are we supposed to do, and what is the consequence if we do what you ask? Well, we draw from all the discussions. I mean, this topic has been written about ad nauseam. And certainly, at the state court level, which is where it exists, you would not be retried. I mean, there's a case, People v. Cole, which was a lower court case out of Brooklyn that talks about this issue. And the bottom line is, because a court is stepping in and hearing evidence old and new and hearing evidence that is reliable and that could be considered by the court but may not ever be considered by a jury because of the rules of evidence, the court is looking at it holistically and is in a position to actually grant the relief of dismissal. So, in its pure sense, that's what it is. That's what we're doing. Yes. And I think that that's what the law says you can do if we get through cognizability and effectivity. But then what do we do? Again, assuming we get past all those procedural hurdles and we get to the merits, what do we do with Ms. Velazquez? We say, never having heard her, never having had a federal judge, even a magistrate judge in this case, hear her, on the cold record, because of all the problems with Ramos, we would be deciding that we don't believe Ms. Velazquez's testimony. Don't we have to decide that, that she is mistaken? Well, the way I thought about this is on de novo review, you have her trial testimony and you have what happened at the trial in regard to her direct and cross examination. But you know what's funny about her trial testimony is that I see that the prosecutor in the case himself seemed to think that Ms. Velazquez didn't make a great witness. Do I take that into account in deciding whether to believe her or do I just look at the cold record, which is all that I have, and frankly, I thought she did pretty well. She resolutely insists, a difficult position in some ways, that she did not say the things that, some of the things that Detective Coore reports her as saying. She doesn't bend very much on that, even though, you know, the nature of cross examination and the way that witnesses respond to having their recollection refreshed is often to be bullied into saying, I guess I must have done what the officer said I said. But for the most part, she says, no, he's confusing my description of the shooter with my description of the harasser earlier in the day. I never saw it. She resolutely sticks to, I never looked him, the harasser in the eye. It's just wrong. I don't know where the thing about the red sports car even came from. On a cold record, I thought she did pretty well. Now, I'm also told she didn't really look so good when you did it, not on a cold record, but I didn't have that opportunity to see that. But you're saying that's what I should do. I should sort of take account of the fact that the prosecutor didn't think she was a great witness and sort of rested his case a lot on Ramos. And so we disregard her testimony? It happens in gateway analysis where the court looks at the record and makes a determination as to whether or not innocence has been proven by a preponderance. This is just the next level, and you go to whether or not they've proven it by clear and convincing, innocence by clear and convincing evidence. Yeah, it's a bigger deal, not only because the standard is elevated, but because we are doing something, you're asking us to do something that is literally unprecedented under federal law, right? I mean, there is no case in which a federal court has actually, whatever dictum there is, whatever possibilities there are, says. Well, it's more than dictum, I think, because you have, first of all, the Georgia District Court. Okay, fine. Don't call it what you want to call it. Call it what you want to call it. You are asking us to do something that no federal court has ever done, yes? Correct. But I'm asking you to do something that I think is just and extremely important because this court or federal courts are the last line of defense for a state prisoner who has been incarcerated or convicted and actually innocent. And the writ is there for the purpose of enabling you to do something. Okay. Well, this probably brings us back to where we probably should have started, and I'll let you go, because this is all about the question of the cognizability and the standard of review questions that come up under AEDPA because, you know, one big question here is why are we not only the last but the definitive word on someone's innocence? Why, after a jury, an appellate division, the court of appeals, back to the state trial court for a state habeas, where the state definitely recognizes actual innocence claims as cognizable, the state judge, the state appellate division, then back to the district court, the federal judge, The three of us sitting here or listening on tape are the definitive judges of whether this is an innocent man or not. Well, thank God we can go this far because I don't think that, and I don't think I'm going out on a limb, that there's any doubt in light of that gateway hearing and the evidence that was presented that there was an injustice in this case.  And I just want to go back to your question about, you know, what happens. Well, you could remand it and you could say, look, we need to have a trial, we bring it back to the state court. I don't think that that's what the doctrine says, you know, but there is a philosophical question that you're raising. Who are we to take away from a jury, from the people, this ultimate decision? It is an interesting place to ask a court to bid. Can I ask another question? So are we required to analyze the gateway, the Schlupp claim, or can we skip that claim as we sometimes do in the jurisdictional context, for example, and go right to the merits and deal with the penholster issue? So, yes. I mean, we argue that in our papers and we think that the gateway was granted, we thought, resoundingly, by Judge Nathan. The certified question is freestanding actual innocence, and you expanded it, actually, to due process. But, yeah, I don't think the gateway— You meaning me? You. You would actually rule, Don. You're on the second circuit. Yes. Not me. You. I do nothing alone. I'm one-third of a judge. Oh, I'm sorry. You were on the panel that expanded the certificate to due process. But I think we're past gateway. I don't—I mean, I could re-argue— No, no, no. My question is do we need to go through the gateway analysis specifically in order to get to the merits, that is, actual innocence? No. No. I mean, I think what you do is—and, unfortunately, penholster puts us in a bad spot, I think, for justice, which is that you have to look at the cold record and you have to— Well, that's why I asked the question. Yeah. So, arguably, one could view the penholster issue, that is, the merits, as easier than the gateway issue in a way that's adverse, I think, to your client, as you just suggested. And you're telling me that we don't even—we could just look at the—assume that he's satisfied the Schlupf standard. We could just look at the merits themselves under penholster. Yeah. Well, we make an argument in our brief that Aetba should not even come into play because a freestanding claim of actual innocence is a unique animal and it would be— Assume that— So let's assume it does. Let's assume it does. You get into D2 analysis and you have to look at the affidavits and everything else that was in the state court record and determine whether it was an unreasonable determination of the facts based on the evidence below for D2. How do you—if we're just focused, as penholster and other cases from the Supreme Court instruct us to do, if we just focus on the state record without reference to the other record that was developed by Judge Francis, for example, how do you account for Ms. Velazquez? How do you account—how do you prevail? Velazquez, I mean, in our view, imploded at the trial. And I know that— But you say in your view imploded at the trial. But I read someone, an eyewitness, who says I was only a few feet away from the person who shot my partner. She gives a description of a 25-year-old Dominican male with jerry curls, which is a very distinctive hairdo. Our client, Mr. Jimenez, has straight hair. He's 17 and he's Puerto Rican. And the Puerto Rican-Dominican distinction would come into play— Yet, wait— And it comes into play in the affidavit— Wait, wait. If we're looking at only the state court record—I guess we're looking also at the state court habeas record or post-trial record, and that includes evidence that Mr. Jimenez is Puerto Rican. Excuse me? That state court record, the habeas state court record, includes evidence of Mr. Jimenez's ethnicity. Yes. Okay. His birth certificate, his parents' birth certificate. Because mysteriously at trial, although there is much evidence in the questioning of Ramos and Velazquez about are you sure that the shooter was a Dominican and how do you know he was Dominican and so on, no one ever put in any evidence that he was Puerto Rican. Well, and that begs the question, why didn't you raise it in an effective assistance claim and this was all discussed? Because the lawyer doesn't remember and we couldn't get any information from him. And this court can look and see, well, would it be strategic to not focus on that issue or not put in the alibi, for example? Well, I'm not putting in the alibi. I understand the strategic issues there. They're a close call in any kind of case. But not to put in something where he doesn't even have to testify, just get a birth certificate or a parents' birth certificate or something, and show that after all these people, the eyewitnesses insist that the shooter was Dominican, this guy isn't even Dominican. Well, we don't know what the racial makeup of the jury was. We don't know what he was going through. And by the way, we could, I guess for argument's sake, assume he did a great job on Velazquez. I mean, the prosecutor actually says she was not a good witness, and he's going less is more. Okay, let's just keep this simple. Let me not offend anybody here by getting into this distinction because he was perhaps uncomfortable. I mean, I do think that that is legitimate. Okay, I get it. And this is a very important issue, obviously, of actual innocence. And well, you wanted to say one more thing, it sounds like. Yeah, so if I'm going to get cut off, I just- I'm going to give you, yeah. Okay, so I just want to make this point, and this was supposed to be part of my beginning because I think it's very powerful. So Judge Francis, who was the magistrate in the R&R, discussed what would have to happen for Jimenez to be guilty. And he talks about how we would have to lead, and we're riffing on this a little bit, but a double life. He would have to be, on one hand, a 17-year-old New York-born Puerto Rican who doesn't speak Spanish other than his home and with a Puerto Rican accent, has a nickname Spaz and Tito, hangs out in a specific neighborhood with a specific group of friends, doesn't drive a car, doesn't own a car, and doesn't have jerry curls. And then at the same time, he would have had to have slipped away from a birthday party with his friends, go a mile away, and by the way- These all relate to the Gateway claim. Yes, yes. Okay. But I just want to make this point because I think it's a powerful point about the merits of this case. I mean, I can get into Aetba, but I think we might- I don't have time, but- Can I ask you to clarify a little bit your answer earlier to Judge Lea's question, or maybe it's a question about what exactly his question was? It is clear to me that if we go directly to the merits and decide that you lose, we don't have to address any of the preliminary habeas technicalities because all of those technicalities that Congress has imposed do not say, thou shalt not consider a habeas case unless all these hoops are gone through. It says, thou shalt not grant habeas unless all those hoops are gone through. So if we cut to the chase and decided the merits against you, we wouldn't have to bother with all that stuff. But what about the flip side? What about the flip side is what I'm interested in. Suppose we went to the merits directly and thought, we see that this is an innocent person. We believe that it has been proven by clear and convincing evidence or more that he didn't do it. Do we have to address any of the gateway issues there because aren't they subsumed? Or is it that we look at different records for the two things and that's the problem? We say no because- It's a higher standard to decide your way on the merits. So if we decide that, don't we necessarily have found the gateway issue is also- But the protection is built in because it's clear and convincing evidence. But on the affidavits, the problem, there's very good law from the circuit on this, which is that without an evidentiary hearing in state court, which I think is our friend, that circumstance is our friend in this case, it is very difficult for a state court to make credibility findings. And the state court does that. And this is a problem. And there's a section of the R&R, it's special appendix 18 and 19, where Judge Francis talks about, he blends it with the testimony of the witnesses. And this is on the alibi, by the way. But he gets into it and he mentions the affidavits throughout. The affidavits are problematic for the state court in that they go far enough and you can't resolve these issues without hearing from these witnesses. And that is a problem. And that could be an unreasonable determination under D2, which is the equit path, that we ask the court to go down. And we think it's very clear and it's very strong for us. And I'm hoping, we're exciting the court to say, look, we may have an innocent man here. What paths do we take? And are they real paths that work under the law? And we think D2 can be satisfied very easily. If you look at the fact that there was no evidentiary hearing and she makes speculative determinations based on a very, very narrow record. And that's a problem. And I think that passes us through D2. And then the gateway, we're in the promised land in that the gateway evidence then comes in, and then we can do justice. That is how we see this case. D1 also is a path because it's a Brady due process violation, showing him a single photo, telling him this is the guy. I'm not sure it's the guy. This is the guy. That's not disclosed. And under Supreme Court law, that would be a violation of law. He is no longer incarcerated, is that correct? Excuse me? He is no longer incarcerated, is that correct? He's actually in the audience. So that's an answer to your question. There he is, okay. But he still obviously has this homicide conviction hanging over his head and it's destroyed his life. Of course. Appreciate that. Thank you very much. Thank you. We reserve the time for rebuttal. May it please the Court, Matthew White from the Bronx District Attorney's Office for the appellees. The petition is barred by the statute of limitations because it is untimely, and the demanding and extraordinary gateway actual innocence standard was not met. In Hyman v. Brown, this court reversed the finding that the gateway standard was met because the evidence of actual innocence was not compelling. The petitioner did not or could not. I'm sorry. Here, there was no evidence over here in the state court. Correct. And we have a, just focused on the gateway claim, we have an extensive evidentiary hearing that was conducted by Judge Francis. Is that also correct? Yes. Why should, maybe I've misunderstood your opening statement, but the evidentiary hearings seem compelling, and there are no sort of classic post-state evidentiary hearing findings made by the state court here that could be presumed to be correct. Well, the answer to that is it's just like Hyman v. Brown, where the court held an evidentiary hearing. This court deferred to the credibility findings, but ultimately found the evidence induced at that hearing to be insufficient. It wasn't compelling. It did not show that the petitioner could not or did not have committed the crime. And so with respect to the alibi, for example, every judge that has looked at the alibi has found that the petitioner still could have committed the crime. The state court judge, the magistrate judge, and the district court judge. And this following the gateway hearing is specifically what the magistrate judge stated, open quotes, the alibi witnesses do not preclude the possibility the petitioner could have left the birthday party, committed the crime, and returned. And that's the special appendix at S-24. Well, is that truly the standard? It says, I mean, the way you quoted the standard, it says could not have or did not. And I mean, is it, does it have to be impossible, a violation of the law of physics that he could have committed the crime? Or is it a question of, do we find beyond a reasonable doubt that he simply did not do it? Or do we find by clear and convincing evidence that he simply did not do it? Because the, yeah, I imagine that it's a close call that he could have at least made one trip away from the birthday party, if we believe the alibi witnesses, which is another problem, that's accredited by the judgment. But he could have gotten that distance in the amount of time, because the alibi witnesses either don't say, you know, they either say, well, he wasn't really with us the whole time, or it's hard to believe that he really was with them the whole time. He could have made a run over there. But it seems bizarre. And as Mr. Garber points out, there were all these other issues. It's not just could he have made the trip, but could he have put on a wig with jerry curls? Could he have suddenly aged in appearance along the way? Could he be the guy that Ramos knew as Momoskilo in the first place? You know, there's a lot more here than just could he, consistent with the law of physics, without being the flash, have made it from one place to another. Well, I think when we look at the cases where alibi evidence has found to be compelling, they demonstrate that there's a much higher standard, right? Here, the magistrate merely found it, quote, unquote, unlikely the petitioner left and returned. But I submit to you that is not compelling. So, for example, in Rivas v. Fisher, this court found the gateway standard was met, where new, unchallenged forensic evidence showed that the murder occurred at a time when the petitioner had an unchallenged alibi and the medical examiner who claimed that the murder could have occurred earlier resigned due to allegations of corruption. That I submit to you. The two big kinds of compelling evidence cases, it seems to me, are DNA evidence and a confession by somebody else who has no motive to exonerate this person. And those are the kinds of cases that are, it seems to me, the ones where state courts have typically found an innocence, actual innocence claim, as opposed to one that is riddled with credibility judgments that would have to be made, right? I mean, you have to believe the alibi witnesses. You have to disbelieve Velazquez. I guess the easiest one is you have to disbelieve Ramos, who is self-discrediting. Disbelieve Ramos' testimony at trial. But these are all credibility judgments that we are being asked to make essentially on a cold record or in part by deferring to a federal judge who took testimony where there's a real question whether the Supreme Court wanted him to take testimony. Right. And also in Rivas, the court noted that, quote, unquote, a lesser showing would not satisfy the gateway actual innocence standard. And that's sort of where we're at here. And the other case in which an alibi was found to be compelling evidence that the petitioner could not or did not do it is Schlepp v. Delo. And in that case, the petitioner was on videotape 65 seconds before the crime was reported in a cafeteria. And Schlepp introduced evidence showing that since the incident had been promptly reported, he could not have committed the crime. So, again, it's not impossibility, but it's a very, very, very high level for the gateway actual innocence standard. Extraordinary. Demanding. Rare. Those are the adjectives that are used to- That is the level of deference that we are- That's built into these levels of deference, no? Am I wrong about that? I mean, the way I view it is it's very much like Hyman v. Brown, where even taking into account the credibility findings of the lower court, the evidence still wasn't compelling. It still wasn't compelling because it did not show that he did not or could not have committed the crime. And the other evidence besides the alibi that was adduced was similarly uncompelling. The sociolinguist's opinion was described as, quote, unquote, weak by the magistrate. It's certainly not like the scientific evidence in Rivas. And the magistrate judge found petitioner's own testimony to be of, quote, limited support to his claims. Ramos' recantation is obviously not compelling. And I want to focus in on specifically what the magistrate judge said about Ramos' recantation. He found that his statements were reliable only for establishing the limited propositions, that he has provided multiple inconsistent accounts of what precisely he saw on the day of the shooting, that he has always believed the shooter was Dominican, and that he is now convinced Mr. Jimenez is not the shooter. Now, you know, this doesn't even make any sense because given that Ramos provided multiple accounts of the shooting, how does that make him credible? I mean, the one thing we do know about Ramos is that he did, in fact, see the shooting because he testified that there were four gunshots and including the last shot to the head at close range. And that was confirmed at the autopsy because Michael Brana had four gunshot wounds and the headshot wound had stippling, which only happens from a gun that's fired from, I think, two to 18 inches. So Ramos' beliefs, you know, subjective beliefs are not compelling. He obviously saw the shooting, and he was the first person to identify petitioner as a suspect. He looks through trays of photos, and so it's obviously a non-suggestive ID procedure, and he picks out petitioner's photo, and then they create a photo array. They show it to Ms. Velazquez, who previously has not made an identification, and she picks out the petitioner as well. So you have that corroboration of Ramos' initial- Well, I think there is other- So can we consider the fact that, well, maybe you're going to get to the mounds of other evidence, but can we consider the fact that, at least on my reading, and I've read through the transcripts, can we consider the fact that there doesn't seem to be any forensic evidence, any other fiscal evidence, nothing? Well, I think the two eyewitnesses who both identify the same person are pretty powerful evidence that this is, in fact, the shooter. And Ramos is, you know, for all his statements about hiding under the almond tree- So with respect to the compelling nature or not- Hold on one second. With respect to the compelling nature of the evidence or not, should we consider the weakness or the strength of the prosecution's affirmative evidence? Well, as I said, I think when you have two eyewitnesses saying he's the shooter, that's pretty powerful evidence. And how about the recantation? The recantation, I mean, Ramos is sort of exhibit A for why recantations are unreliable evidence. You sort of have to look at other evidence that corroborates what Ramos has said, and it's those statements that are corroborated that you can accept. So in Cosi, there was a form of recantation. I'm sorry? In Cosi, there was a recantation. And there, the state court in the state court proceeding found it effectively not credible. Here, we've got the opposite. We've got a recantation where Judge Francis saw the witness and heard the witness, heard the other evidence, and determined that the recantation itself was credible. That's all we've got. And it's in part because we don't have, there was no evidentiary hearing from the state court. So what are we to make of that? So briefly, the magistrate didn't credit Ramos' recantation in full. He only credited Ramos' recantation for those three limited propositions that Ramos had provided multiple events of the shooting that he always believed. Yes, but doesn't that effectively constitute a finding, and it's one that I would say is very well supported, that based on the totality of the record, one simply cannot count Ramos as a helpful witness for the prosecution anymore. It's not a question exactly of his recantation is gospel. It's a question of he's given multiple inconsistent accounts at various times of what he did and what he saw, and we just have to put a big X through him. Well, and then even if you do do that, and I submit that you shouldn't, because the record shows that he only identified the petitioner at trial after being assured that he would not be heard. Well, this is another – yeah, I recognize this fact. Can I just help you out a little for a moment? That Mr. Ramos says before the prosecutor sort of leads him with the assurance that he won't be harmed and so on, he says earlier that he's afraid to even look at the defendant in the dock because he's afraid. So when we go back through all of these things, as with any recantation, one has to address the possibility that the man was reached in some way. Now, that's entirely speculative. We don't know about that, but it is an obstacle, I think you would probably say, to just saying put a big X through Ramos. I mean, I don't – I'm not sure that I really understand the question, Your Honor. I'm sorry. Never mind. Go ahead. Do you also – you heard my question to your friend on the other side. Do you also agree that we could just analytically, just procedurally, skip the gateway issue and go right to the merits? If we determine that the merits issue arguably is easier than the gateway issue. Of course, Your Honors, could. Is there anything that prevents us from doing that? But I also haven't seen anything that says that we can proceed in this way. I mean, the district court obviously only decided the petition on the merits. And if this court were to just simply- Well, no, it didn't. First, there are two opinions, right? Right. There's the gateway opinion and then there's the merits opinion. Right. So it did both. And it's interesting. In the gateway opinion, the district court sided to the district court opinion in Hyman v. Brown, which this court then reversed because, again, the evidence of actual innocence was insufficient, was not compelling to show the – to meet the gateway standard. And the gateway standard would be as a lesser standard than the hypothetical freestanding actual innocence claim. And ultimately, if the court were to reach the merits, it should affirm, because the freestanding actual innocence claim is not cognizable, as this court noted in Hyman and the Supreme Court has repeatedly noted. And the Brady claim is meritless. I don't know that we've said that it's not cognizable. Well, it's not something – I believe the court in Hyman said it's not something upon which relief could be granted as a substantive claim. And so the Brady claim is, in fact, subject to the heavy Ed Pradet deference, and the state court properly rejected it. I mean, the state court found that Ramos affidavit, which is the entire basis for the Brady claim, was belied by the record. Ramos, as I noted before, was the first person to identify the petitioner before any allegations of police misconduct. Ramos never explains that. Then the Ramos affidavit claims he, quote-unquote, had to identify the petitioner at trial, but that's obviously false because Ramos did not, in fact, initially identify the petitioner when the prosecutor asked him if they saw the shooter in the room. He only identified the petitioner after being assured that no one would hurt him and that he swore to tell the truth. He obviously was not a coerced witness. And I know my time is over. I just want to make one more point. The entire basis for the Brady claim, that Ramos thought the shooter was Dominican, was disclosed at trial. It was disclosed. So there's no prejudice under Brady. At trial, Ramos testified he thought the shooter was Dominican. And when asked how he knew, he didn't say the detective told him, which is, again, more evidence that that never happened. Rather, he said he knew him for a year or two. And the petitioner and his counsel did nothing with that information. They never, as Your Honor pointed out, tried to introduce evidence that he was born in New York, two parents from Puerto Rico. So, you know, the whole thing was disclosed. Thus, there could be no prejudice, which is obviously an element of Brady. So for all these reasons, I ask that Your Honor's affirm. Thank you very much. Mr. Garber. Yes. Okay. So Hyman is a case that we actually litigated. But Hyman says that an alibi is the type of evidence, if it's a strong alibi, that would constitute sufficient evidence for the gateway. It was a gateway case. And in Hyman, the recantation was, I didn't see, not that it's not him. So here we have an alibi that shows it couldn't be him were so highly unlikely. And we also do have Ramos. Who I do think does have some value. And this is for Judge Lynch a little bit because you were saying that Ramos could be a watch. There were findings by Magistrate Francis who saw him testify where he says that, I do not doubt the sincerity of Mr. Ramos' belief that he identified the wrong man at trial. Sincerity is different from accuracy. Well, that may be. There's not a finding that Ramos is clearly telling the truth, not just subjectively, but is accurately reporting what happened on that date. Maybe. And it would be very hard to make that finding, frankly, because look how much time has passed. Listen to what he says about the nonexistent almond tree and where he's hiding or whatever he's doing and how he doesn't see anything really. All of that is very peculiar. So it's not as if you have, putting aside what I think of it, we don't have Magistrate Francis saying Ramos is credibly saying that Mr. Jimenez did not do it. He's saying I believe that he believes that. Right after that statement, and I'm not disagreeing with what you're saying, there's a paragraph that talks about Ramos more substantively, and I think it goes farther than just saying so. So it's essay 21, and this is what he says right after that sincerity comment. I also find that Ramos had ample reason to believe that the shooter was Dominican and was able to differentiate between Dominicans and Puerto Ricans. First, he heard the shooter use a Dominican slur and speak with a Dominican accent. He's finding this as a matter of fact. Second, he believed the shooter to be Montague, a person he had known for a year or two and knew to be Dominican. And third, he testified credibly about his ability to differentiate. There's another thing here that is born, that is baked into the record, which is that Jimenez is not Dominican. He's Puerto Rican, and there's a birth certificate. You have Ramos as a rather difficult person to credit anything he says by this point. He says that he heard all of these statements. Ms. Velazquez says the shooter – I never heard the shooter speak. She also thought that he was Dominican apparently because he was with other people who were speaking with Dominican accents, but she's quite unequivocal that she never heard him speak. So do we have to credit that Ramos actually heard the shooter speak? I guess. Look, I don't – I mean, your point that, look, Ramos is a wash I think is good enough. I do think that he has some value, especially given the Dominican-Puerto Rican distinction and the fact that Jimenez is Puerto Rican. But I don't know if it matters. It does also not make a difference in terms of the Dominican issue that there's a question, of course, of whether if a person – which I credit that a person of Puerto Rican descent and background could listen to someone who's Dominican speak and tell that they're Dominican by their accent. I'm not sure exactly how much they'd have to speak. But the key statement – there's only one sentence that even Ramos attributes to the shooter, right? In his statement, it's actually – there's a police report where he goes farther, and I think there's a few words that are stated. Not just mama – not just mama weba. The key thing is one – the key thing is one word of slang. And we also know that one of Jimenez's close friends who is one of the alibi witnesses is Dominican. So it's one thing if you say I heard this man say a paragraph and he's clearly Dominican by his accent. It's a different thing to say I know he's Dominican because he used a particular obscenity, which could easily be picked up by an English-speaking New Yorker who happens to know some Dominicans and hang out with some Dominicans. It's about probabilities, obviously, and say it's highly unlikely that he would use that in that moment where it's heated and it's violent. He would have used cabrone. There's a sociolinguist whose affidavit is in there. It talks about this and say – But she doesn't talk about the difference between the two words or show some empirical evidence of who says what exactly. No, but there's a case, Echeveria, which is a Massachusetts district court case that talks about the difference between cabrone and mama webo in a very similar context, but it's one of multiple things, and it kind of ties into – so he goes to – he slips away. He goes there, and then he poses as this Dominican, and, I mean, I think that is – is it possible that he could have picked this up? In isolation, I guess, maybe, but you have all those other problems that you were just talking to Mr. White about that I think are really problematic for the state in this case. Just – could I say a few other things? The impossibility standard, I think he acknowledged that it's not impossible, and the way the district court phrases it, it sounds as if that is the standard that they're applying and they're pulling from Hyman in a way that I don't think is fair. There's a fantastic amicus brief that was submitted to the court that covers the impossibility standard, which I think is very important because this may boil down to that, and we think that it's so highly unlikely that we meet the freestanding innocent standard, and then we pass through D-2 for the reasons I said, especially the absence of a hearing, and we'll take whatever we can get, Judge. If you want to remand it to the state court for a trial because you're concerned about – Can we even do that? No, you could remand it. I don't know. So our review is de novo of a district court opinion, correct? Well, I guess you're right. So, okay. I just don't – I mean, that's a very – Okay, can I just say one thing? That's a philosophical problem that I don't know if I can solve right now. Well, I don't know if it's philosophical. It's plain legal. What is it that I have to decide in order to decide for you? Do I have to decide that I have a reasonable doubt? Do I have to decide that any reasonable juror in a hypothetical retrial would have a reasonable doubt? Do I have to decide that I believe affirmatively that Mr. Jimenez is innocent? And if so, what degree of confidence do I have to have in that belief? Is that I am persuaded that it is more likely than not that he is innocent, that I am persuaded that clear and compelling evidence says that he is innocent, that it is beyond a reasonable doubt that he is innocent? What is it that you think I need to decide in order to decide? I'm sorry, the case for you on the merits. Clear and convincing evidence that no reasonable juror properly instructed can find guilt beyond a reasonable doubt. That's the schlup. No, no. Clear and convincing evidence. Schlup is probability. But – No reasonable – There are two decisions, right, that you're asking us. We've got to get through this gateway, I think, but if – No, no, no. We satisfied the clear and convincing at the district court level on the gateway. They found credible and compelling evidence that rebutted the state court record by clear and convincing evidence. That's one thing. But what – but the ultimate on the merits – On the merits. So if we pass through either D2 or you find EPA doesn't apply, clear and convincing evidence that no reasonable juror properly instructed under law would find guilt beyond a reasonable doubt. And here I come back to Ms. Velazquez, and the reason I come back to Ms. Velazquez is that every time I sit, almost, I am asked to decide a sufficiency of the evidence question on direct appeal of federal cases. And one of the things I have to decide is could any reasonable juror have found guilt and routinely I apply the law that says it's a credibility judgment. If there is a witness who testifies, I saw this happen, this is the truth, whether I think if I were sitting on the jury, I would have a reasonable doubt or not, that is sufficient because a reasonable jury could always believe that person's testimony. So how is this different? Here, and another point I didn't make is Velazquez, not only does she get trashed by the prosecutor, but on the jury delivery, the jury is out for two days. They deadlock and then they ask for the wanted poster that was shown to Ms. Velazquez before she made the lineup identification. They couldn't see it because it wasn't in evidence. And then they ask for Ramos' testimony. They hear the readback and then they convict. I mean, I do. And they convict. After they hear Ramos' testimony again, but Ramos is awash. I mean, Ramos is out of the picture. I'm getting at Mr. Garber. I mean, you've tried these cases. You've been here before on exactly those federal direct review cases, and you've probably made an argument just like that, or you've heard other people make arguments just like that, that if you look at the jury's deliberations, if you look at the prosecutor relied more on this witness than on that witness and so on, that clearly this is not sufficient evidence. And the answer always comes back. There was an eyewitness that the jury was entitled to believe sufficient evidence. And now you're saying that not just in a federal case on direct review, but on a habeas case 20 years later reviewing a state conviction, we get to apply actually not a standard that is super difficult to meet, but a standard that is, in effect, easier than the standard that we apply routinely on direct appeal of federal convictions because it allows us to decide that we don't believe the witness or that we think it's likely, based on what the prosecutor summed up on or what they asked for in deliberations, that the jury didn't believe that witness, which is something that we never do in the ordinary case. It's not an ordinary case. But you also have the alibi. You have the recant. And all that is... But all of those... It doesn't mean... This is my pinholster problem. This is also your pinholster problem. Your problem is my problem. You're our audience. When I first was appointed... I'm just doing that for pinholster, not for you. When I first was appointed to the bench, there were three cases that came out from the Supreme Court, with which I disagree. One of them was pinholster, but all these habeas cases that confined our ability to review claims such as claims of actual innocence. And I believe that we're stuck with the state trial record and the state habeas record. And so our range of view, with respect to the merits issue, at least, is very limited. And now we've got, as Judge Lynch... I've been very focused on Ms. Velazquez as well. We've got a witness, an eyewitness. She may... Some jurors may have thought her initially not credible and thought that she was tainted by the wanted poster and so on. But ultimately, they convicted. All I could say on Velazquez, I think that Judge Lynch is giving her too much credit. And maybe the read, maybe a second read on her testimony... We're not giving her too much credit. It's the jury that seems to have credited... I don't think we could... And you heard my questions to your friend on the other side, which is there are only really two witnesses. It comes down to two witnesses, Velazquez and Ramos. Yeah, but also... All they need to do is credit one. It's all the evidence old and new. So it goes back in a much different light. And if you just have that one... It's a shaky ID. Given her description difference, that's it. And by the way, if there's a retrial and you have to figure that in, we get an eyewitness identification expert if we go back to state court because now that's the law. Well, you also get the benefit of a witness who's 20 years removed from the events and therefore whose credibility is undermined automatically, which is different than the witness who testified fresh or relatively fresh. But that is the world we live in and it's not... I mean, I understand it's difficult. And I understand that Aetba, going back to the pinhole sort of thing, puts us in a place where we have to be contortionists. But the hope is that the goal is to try to get justice, if we can, under the law and under the facts. And we think that this case has all the ingredients. We very much appreciate this. Garner v. Lee is a Second Circuit case. I believe I'm citing that right. That, I think, is the answer to the pinholster problem. And that gets you through D2. And then, like I said, you could consider the gateway and you have the whole kit and caboodle on de novo review. Thank you very much. And we urge you to grant relief. Very well argued. Mr. Jiminez, thank you for being here. Thank you.